**FLYNN v. SMITH.**
No. 6029.

Circuit Court of Appeals, Seventh Circuit.
May 26, 1937.
Rehearing Denied June 26, 1937.

306

George M. Barnard and Raymond L. Walker, both of Indianapolis, Ind., and A. W. Matt, of Peru, Ind., for appellant.

Walter R. Arnold, of South Bend, Ind., and O. F. Rhodes, of Peru, Ind., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

SPARKS, Circuit Judge.

Appellee filed her bill in equity for relief from a breach of a fiduciary relationship by the First National Bank of Peru, Indiana. She alleged that the bank, as executor of her deceased husband's will had induced and permitted her to believe that she was personally liable for her husband's debts, by reason of which she paid and assumed them in the following particulars: She paid $12,805.20 out of her personal deposit account in that bank; as payee she endorsed and delivered to it a check for $2,000 of which she was the owner; she executed to it her note for $7,964.57 in lieu of her husband's note upon which there was due a like amount; and she increased a note and mortgage on her real estate from $1,000 to $5,000, the increase of $4,000 being credited on her note to the bank which reduced it to $3,964.57. The decree allowed a general claim as a deposit creditor for $12,805.20; it allowed her a preferred claim for $2,000; and it rescinded her note and mortgage to the extent of $4,000. The errors relied upon for reversal pertain to the sufficiency of the evidence to support the decree.

The findings contain the following facts: The decedent for many years was an officer of the bank and at the time of his death, on February 28, 1930, was its vice-president and assistant trust officer. By his will he devised and bequeathed all of his property to appellee, his wife, and named the bank as his executor. It qualified and acted as such and made its final report, which was approved, and it was discharged and the estate was closed in the Miami Circuit Court of Indiana at the April term, 1931.

At the time of his death, or within two months thereafter, the estate was insolvent to the extent of more than $9,000. The entire personal estate which was of the value of $21,718.47, consisted principally of stocks, bonds, and a small amount of life insurance. Among the assets were thirty shares of the National City Bank of New York of the appraised value of $5,600, and two bonds of the Fox New England Theatres, Inc., each of the face value of $1,000 and appraised at par. The liabilities aggregated $30,864.56. Included therein were two notes payable to the Wabash Valley Trust Company, upon one of which there was about to become due in principal and interest the sum of $7,736.80 and which was collateralized by the thirty shares of the National City Bank; the other was

about to become due in the sum of $1,877.75, and was collateralized by the two Fox bonds. Also included in the liabilities were several promissory notes, payable to the First National Bank of Peru, aggregating $19,312.80 principal and interest. These, save a note for $1,000, were secured by various stocks and bonds of a probable value not exceeding $10,000. The note of $1,000 was a joint note of decedent and his wife, and was secured by a mortgage on their home, which was owned by them as tenants by entireties.

The decedent had insurance on his life aggregating $17,000 which was payable to his wife. One of these policies for $15,000 was paid to her by check of the Company on March 17, 1930, which she immediately deposited in the appellant bank, and for which she received a certificate of deposit. The other policy for $2,000, in another company, was subsequently paid by that company's check made payable to her and endorsed by her at the request of the bank. It was collected for her by the bank, but without knowledge on her part that the policy was payable to her. The proceeds thereof were applied by the bank to the payment of decedent's debts.

Soon after decedent's death appellee had frequent consultations with the officers of the bank with respect to the estate. She reposed the utmost trust and confidence in the bank and its officials, and relied explicitly on their advice and judgment, having had no business experience herself, and being unacquainted with the business affairs of her husband. The bank knew of her trust and confidence in it, and at no time suggested to her, or directed her, to seek other advice and counsel.

Under these conditions the bank, on March 25, 1930, informed appellee that the Wabash Valley Trust Company intended to proceed immediately to the collection of decedent's obligations to it; that there was likelihood that a judgment would be taken against appellee unless those notes were paid, hence it suggested to appellee that she apply a part of the insurance money which she had received to the payment of them. She believed and relied upon that information and consented to the suggestion that the amount of the notes secured by the National City Bank stock be paid out of her certificate of deposit for $15,000, which was drawing four per cent interest per annum. The bank thereupon issued its draft for $7,736.80 payable to the Wabash Valley Trust Company and charged her deposit account with that amount, which was accomplished by the surrender of her original certificate of deposit and the issuance by the bank to her of a new one for $7,263.20, and a draft payable to the Wabash Valley Trust Company for $7,736.80, which was delivered to, and accepted by, the Trust Company in payment of said indebtedness. Thereupon the Trust Company delivered to the appellant bank for appellee the thirty shares of the National City Bank stock. Subsequently, on August 20, 1932, appellee delivered that stock to the appellant bank for the purpose of having it transferred to appellee on the books of the issuing bank. That was accomplished, and on October 7, 1932, the new certificate in appellee's name was received from the National City Bank by appellant bank which notified appellee that it was holding the new certificate and requested her to assign it to appellant bank as collateral for decedent's indebtedness to it, then represented by notes which it had previously procured appellee to subscribe, as hereinafter set forth. She declined to make the assignment, and the bank declined to deliver the certificate to her, holding it listed on its collateral ledger as security for decedent's debt which she had assumed, until after the institution of this suit, whereupon, at the commencement of the trial appellant tendered it to appellee in open court. The tender was declined and the certificate was deposited with the Clerk of the court for her benefit.

On April 25, 1930, out of funds in its hands as decedent's executor, the bank paid the balance on the notes owing to the Wabash Valley Bank, in the sum of $1,877.75, and thereupon received the two Fox bonds. The bank on July 28, 1930, without the knowledge or consent of appellee, sold these bonds as property of the estate for $1,240, and applied the proceeds to the payment of decedent's debts.

On May 26, 1930, appellee had a credit balance on her certificate of deposit account in appellant bank, upon which she was being credited with four per cent interest per annum. Thereupon the bank advised her that whereas the indebtedness to the bank was drawing six per cent she could save two per cent by making a payment on the indebtedness, to which appellee acquiesced, still believing, and the bank knowing of her belief, that she was liable

on her deceased husband's notes. Accordingly she surrendered her certificate to the bank which issued her a new certificate for $1,956.98 and credited $5,068.40 on the indebtedness to the bank, which was secured by pledge of other stocks and bonds of the estate.

On June 19, 1931, interest having accrued on the debt balance in the sum of $701.77, making a total indebtedness secured by collateral of $7,964.57, appellee, laboring under the same erroneous impression created by the bank that she was liable on the obligations of the estate, executed her note to the bank for that amount, whereupon the notes secured by decedent's collateral were marked paid and assigned and delivered to her. At the request of the bank she thereupon reassigned that collateral to the bank as security for the note which she had executed in the sum of $7,964.57 without consideration other than her assumption of her husband's debts.

This note was subsequently criticized by the bank examiner and that information was communicated to appellee by the bank together with a request that she increase the mortgage on her home, which was her separate real estate, from $1,000 to $5,000. She did not at that time comply with that request but sought the advice of her supposed friend, one Chamberlain, who was not then connected with the bank, having severed his connection as cashier and assistant trust officer thereof on June 30, 1931. Before his retirement he had looked after the affairs of the decedent's estate, and had full knowledge of, and much to do with, the transactions hereinbefore recited which occurred prior to his retirement. Upon being advised by him to comply with the bank's request, she executed her two notes to the bank on June 1, 1932, for the total sum of $5,000, together with a mortgage on her home to secure its payment. These, together with $159.69 in cash for accrued interest, were received from her by the bank in payment of the former mortgage of $1,000 on her home, and as a credit of $4,000 on her note to the bank of $7,964.57, which she had given for decedent's indebtedness, thereby reducing that note to $3,964.57. The balance remaining in her certificate of deposit account with the bank, amounting to $2,194.80, was withdrawn by her from time to time for her separate use.

On May 1, 1931, the bank as executor filed its final report showing all debts of the estate paid, together with appellee's statement under oath that she had received the remaining surplus, and that the bank had acted in a satisfactory manner as executor in the settlement of the estate. Neither the final report nor the findings disclose the amount of surplus of personalty, the account not being set forth. The record discloses the amount of surplus to be $187.50. The final report, however, states that decedent died the owner of two city lots in Peru, of which appellee should be declared the owner in fee simple under the will. The record makes no mention of their value, nor were they considered in the briefs or arguments.

The court further found that at the time appellee signed her approval of the report she was still laboring under the impression that she was liable for her husband's indebtedness and the bank then knew that she was under that impression, and that she was then relying upon it in its preparation of the report. On May 5, 1931, the bank prepared and filed an inheritance tax report of the estate with the probate court, in which it made no mention of any indebtedness owing by decedent to it, and listed the fair cash market value of the estate at $14,971.50. At no time involved was the total value of the estate in excess of $19,746.98, nor was the estate solvent at any time during the administration, which fact the bank well knew, and appellee did not know until several months after the final report was approved and the bank was discharged as executor.

The bank continued to hold all of decedent's stocks and bonds, except as hereinbefore referred to, and now holds them as collateral to appellee's notes which she executed under the circumstances above set forth.

The court further found that the bank did not perform its duty of making truthful disclosure to appellee, but deceived her as stated, and thereby induced her to part with her insurance money, when otherwise she would not have parted with it; that as a result thereof the bank profited thereby to the extent of her two policies totaling $17,000; that there was on hand, in cash, at and belonging to the bank at the time the receiver was appointed, over and above the other trust funds, in excess of $17,000.

Upon these facts the court rendered certain conclusions, the substance of which is

set forth in the margin.[1] The decree followed the conclusions and assessed the costs against appellant. So far as pertinent to the issues here presented, the substance of the decree is set forth in the margin.[2]

Appellant contends that the court erred in finding and concluding that appellee should be placed in status quo as a deposit creditor of the bank to the extent of $14,393.04. In support of this contention it insists (1) that the withdrawals from her deposit account were not shown to have been made or induced by fraud or any breach of any relation of trust and confidence existing between her and the bank; (2) that the evidence is not sufficient to show that there was any overreaching, fraud, concealment, or any unfair advantage taken of appellee which would justify such findings or conclusions.

 There is a considerable amount of substantial evidence which supports these

---

[1] (2) The bank is entitled to have assigned to it and become the owner of all of the collateral stocks and bonds which it did not part with, whether originally pledged with Wabash Valley Trust Company, with the bank, or which it heretofore held as executor of the estate of decedent; and is entitled to all property and funds formerly of the estate and now in its hands.

(3) The plaintiff is entitled to have released and reduced so much of the mortgage on her real estate mentioned in Finding 13 as exceeds $1,000 and interest accrued thereon, calculated in like manner as if said mortgage debt had never been altered or increased to $5,000.

(4) The plaintiff is entitled to all the rights of a deposit creditor of the bank as holder of a certificate of deposit, drawing 4% interest per annum (subject to interest suspension by virtue of receivership) on such certificate for $15,000, less withdrawals thereon for her own account in the sum of $2,194.80 as set forth in finding No. 14, leaving to her credit (exclusive of interest) $12,805.20.

(5) The plaintiff is entitled to all of the rights of a beneficiary of a constructive trust as to the amount of $2,000 collected for plaintiff by the Bank from Guaranty Fund Life Insurance Association and appropriated by it to payment of the debts of decedent, including such as were owing to the bank, and as to said amount plaintiff is a preferred creditor of the receiver.

(6) Plaintiff is entitled to recover her costs herein against the receiver.

[2] (1) That plaintiff is placed in status quo as of March 25, 1930, in respect of a certain certificate of deposit of $15,000 issued to her by First National Bank of Peru, Indiana, on March 17, 1930, drawing interest at the rate of 4% per annum from that date to April 21, 1933, being the date on which the affairs of the First National Bank of Peru were placed in the hands of a conservator; said amount being diminished by the sum of $2,194.80 with interest thereon at the rate of 4% per annum from March 25, 1930, to April 21, 1933, to-wit: a total deduction of $2,466.96 from the total amount of the certificate with interest added $16,860, leaving a balance, which constitutes a general deposit claim in favor of the plaintiff and against the bank and its receiver, in the net amount of $14,393.04 against which plaintiff has the right to set off the amount of principal and interest owing by her on the note and mortgage in favor of the bank as hereinafter decreed.

(2) That plaintiff is decreed to be placed in status quo as of March 17, 1930, in respect to the amount of $2,000 collected by the bank and payable to the plaintiff and wrongfully applied by the bank to the payment of debts of the estate of Lloyd V. Smith, deceased, and which amount is and constitutes, in favor of plaintiff, a preferred claim against the cash in the hands of the defendant receiver on September 6, 1933, constituting the time the said receiver took possession of said funds.

(3) That there be released and reduced so much of the mortgage debt owing to her by the bank as exceeds $1,000, principal and interest thereon at the rate of six per cent per annum from June 1, 1932, to the date of this decree, a total of $1,230, and as to the amount of said note and mortgage in excess of $1,230 in favor of the bank the excess is hereby reduced, released and extinguished.

(4) That the receiver is decreed to be the owner of all the collateral security received by the bank from or through the estate of Lloyd V. Smith, and as a result of the administration thereof by the bank, whether now standing in the name of said plaintiff or in the name of Lloyd V. Smith, and "in the event the receiver shall require any assignment, or endorsement without recourse in order to place him in full ownership of said securities, and shall demand the same, the plaintiff shall not be entitled to the benefits of this decree unless within a reasonable time after such demand she shall comply therewith."

findings. While in an equity case findings may be revised at the instance of the appellant if they are against the weight of evidence, Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. ——, decided February 1, 1937, yet, in this case, we are not convinced that the findings are against the weight of the evidence, and we can not disturb them. There is one point, however, with respect to this contention, which we think deserves special mention. It relates to appellant's suggestion that appellee relied upon the advice of the witness Chamberlain, instead of that of the bank, with respect to increasing the mortgage loan on her home for the purpose of augmenting the bank's security for her husband's debts on it, which she had assumed by reason of its representations. It is not denied that the bank suggested the increase of the mortgage, but appellant urges that she refused to comply with its request because she desired to consult Chamberlain, and that she thereby severed the relation of confidence between her and the bank. The record discloses that she merely declined to comply with the bank's suggestion until she could advise with Chamberlain. She made no positive refusal at any time, and the bank made no objection to the delay and did not limit her as to time. Almost immediately she consulted Chamberlain on the subject, and he advised her to comply with the bank's suggestion, urging her to hurry back to the bank before it withdrew its permission for her to increase the mortgage on her home. It will be recalled that about eleven months before that time he had retired as cashier and assistant trust officer of the bank and had severed all connection with the bank, of which fact, so far as this record discloses, appellee had no knowledge. He had attended to the business of the estate up to the time of his resignation, and it was with him that appellee had most of her dealings. It is impliedly suggested that he was a disinterested witness and had no motive for assisting the bank to the hurt of appellee at the time he advised her to increase the mortgage. We think it quite proper to infer that he had a very great interest in protecting his record while with the bank, especially that part of it wherein as cashier he permitted the exorbitant loan to decedent without ample security. Whatever may have been his motive, it is obvious that his advice in this respect was not consistent with the best interests of appellee. Under these circumstances, including failure of proof of her knowledge of Chamberlain's severed relationship with the bank, we think it can not be said that she had severed, and ceased to rely upon, her confidential relations with the bank.

It is further contended by appellant that the court erred in ruling that appellee was entitled to all the rights of a beneficiary of a constructive trust with respect to the proceeds of the insurance policy for $2,000. This contention is based on the grounds, (1) that the assets of the bank were not augmented by that fund, (2) that a trust was not created with respect thereto, (3) that it never became a part of the assets of the bank, and was not in possession of the bank at the time it closed its doors, and (4) it never came into the hands of the receiver.

A perusal of the record convinces us that the court was warranted in finding and concluding that that fund did come into the bank's possession, that its assets were thereby augmented to that extent and that a trust ex maleficio was thereby created in appellee's favor to the extent of the proceeds of that policy. Those facts were not sufficient, however, to warrant a decree of preferential payment of any part of the fund to appellee by the receiver of the insolvent bank. Before that could be done it was necessary that the fund, or some part thereof, remain in the possession of the bank until it closed its doors, and that it pass into the hands of the receiver. In the absence of direct evidence in support of such additional facts, in the case of the mingling of funds, such as we have here, the existence of such facts may be established by the presumption that a trustee will make his disbursements lawfully; that where he has trust funds in his possession for a specific purpose, mingled with other general funds not of a trust nature, he will be presumed to have made his general disbursements out of his general funds and not out of the trust fund. In such case the law will impress the trust upon the lowest balance in the hands of the trustee since the creation of the trust. From this statement it is obvious that the presumption may be rebutted, and if the weight of the evidence discloses that the trust fund, or any part thereof, was expended by the trustee for other than trust purposes, before the receiver went into possession, the presumption will never arise as to the amount of the trust fund actually expended. The presumption is one of good faith and honest

conduct, and of course it will not override admitted or clearly proven facts to the contrary. That trust funds once expended by the trustee will never be permitted to be augmented by subsequent non-trust deposits, as against general creditors of an insolvent estate, is clearly established by the rule which impresses the trust only upon the lowest balance in the hands of the trustee.

The assets of a national bank in liquidation must be distributed pro rata among all its creditors. 12 U.S.C.A. § 194. In order for appellee's claim for the proceeds of the $2000 life insurance policy to be allowed as a preference, it was necessary to establish (1) that such fund was impressed with a trust in her favor, (2) that there was an augmentation of the assets of the bank by its collection, and (3) that the augmented assets had been traced into the hands of the receiver. Blakey v. Brinson, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089, 82 A.L.R. 1288; Brownell v. Turman (C.C.A.) 75 F.(2d) 913. The first two points we think were established, at least we are unable to say that the court's conclusions in those respects are contrary to the weight of the evidence. We are convinced, however, that the third point was not established with respect to that entire fund, and that the findings of fact do not form a sufficient basis from which it can be concluded that the entire fund was traced into the hands of the receiver.

The court found that the proceeds of the $2,000 policy were collected by the bank and by it applied to the payment of decedent's debts. This is quite obvious except possibly as to the surplus which was paid to appellee, as shown by the executor's deposit account. The court made no finding as to whether the fund in question was applied to the debt owing to the First National Bank, or to the Wabash Valley Trust Company. Appellant insists that $1,877.75 of the trust fund was paid to the latter on April 24, 1930. That fact was testified to by Chamberlain. On the other hand, appellee testified that at the time she endorsed the insurance check at the bank's request on April 5, 1930, it told her that the entire proceeds would be applied to the payment of decedent's debt to it. Chamberlain testified that the bank did not ask appellee to advance the $2,000, because at that time the bank had sufficient funds without appellee's advancement, to pay the note of the Wabash Valley Trust Company, on account of having received payment of another insurance policy made payable to the estate in the amount of $1,971.49. The records of the bank, however, disclose that this latter sum was not received by the bank until April 7, 1930, which was two days after appellee had endorsed and delivered her check to the bank. On April 5, 1930, the executor's balance in the bank, including appellee's insurance check, was $2,176.39. On April 7, 1930, after the estate's policy for $1,971.49 was credited, the executor's balance was $4,147.88. Subsequently, up to the close of April 23, there had been other deposits, not here in question, in the total sum of $399.11, and other disbursements, not here controverted, in the sum of $1,358.52, leaving a balance of $3,188.47. The next day there was no deposit, and The Wabash Valley Trust Company note was paid in the sum of $1,877.75, leaving a balance of $1,310.72. It is obvious, therefore, that there were not sufficient funds on hand at this time, exclusive of the trust funds, with which to pay the Wabash Valley note. The conclusion is inescapable that at least $567.03 of the trust funds were used for that purpose, and never came into the hands of the receiver.

No question is raised as to the validity of any of the executor's disbursements in this account except those made out of the trust fund of $2,000. We, therefore, indulge the presumption that the executor did not use the trust funds unless its daily balances show that it did. This, of course, is contrary to Chamberlain's testimony wherein he stated, more than five years after the transaction, that the entire sum of $1,877.75 was paid on April 24, 1930, out of the proceeds of appellee's policy which had been deposited on April 5, 1930, and commingled with the proceeds of the estate's policy of $1,971.49, which was deposited on April 7, 1930. The bank's record contains nothing in support of Chamberlain's statement in this respect, and it is quite doubtful whether the bank at that time thought there was any necessity of charging the disbursement to the proceeds of appellee's policy. Indeed, if it did think so, it was obviously due to the fact that it recognized the existence of the trust, or it did not have sufficient other money of the estate with which to pay the debt.

Further following the presumption we find that the balance of $1,310.72 on April 24, 1930, was not reduced below that amount until July 31, 1930, when it was reduced to $795.12 by the payment of $2,000 to the

First National Bank on decedent's indebtedness to it. Hence, $515.60 of the trust funds, the amount by which the former balance was reduced, was received by the bank from itself as executor, and applied to decedent's debt to it. That amount remained in the hands of the bank until the receiver was appointed and the receiver will be presumed to have received it, because the bank's general balance, with which the estate funds were commingled, was never reduced below that amount, and it was taken over by the receiver. Other notes of decedent to this bank were paid out of this account, but those payments never reduced the balances to which we have referred. No other disbursements were made to the bank, and the surplus on hand of $187.50 was paid to appellee.

It is urged by appellant that of the executor's disbursements, certain sums aggregating $842.90, including the surplus, were paid to appellee for which it asks credit. Of these sums the ledger account discloses that $350 constituted repayments for money advanced by her to the estate, and it is not disclosed that any of those advancements constituted any part of the proceeds of the life insurance, hence it would not be proper to charge them to her as such. The balance of those disbursements aggregated $492.90, which consisted of surplus in the sum of $187.50; two items of "cash advanced" aggregating $275, which we construe to mean cash advanced to her, and one item of $30.40, which she in turn delivered to the bank to pay interest due on her $1,000 loan secured by mortgage on her own property. We see no reason why these items aggregating $492.90 should not be credited to the bank on the proceeds of the $2,000 policy which it received. Appellee insists, however, that the item of $2,466.96, which the court deducted from the claim as appellee's personal withdrawals, includes these items. We do not so understand the evidence. Those withdrawals had reference to appellee's personal account at the bank with respect to the $15,000 policy.

Appellant further contends that the court erred in finding that the estate was insolvent at decedent's death, and that the decree was not sustained by sufficient evidence. From what we have said, after a study of the record, we think these contentions are without merit.

Our conclusion is that the decree should be and is affirmed with respect to the proceeds of the $15,000 policy. The same is true with respect to the proceeds of the $2,000 policy except in the following particulars: The proceeds thereof with interest to the date of the receivership should be credited with the disbursements aggregating $492.90 and interest from the time they were received. Of the remainder, $515.60 should be impressed with a trust in appellee's favor in the hands of the receiver, and should be paid as a preferred claim. The balance amounting to $991.50, with interest to the date of the receivership, should be allowed as a general claim and treated in the same manner as the proceeds of the $15,000. In all other matters the decree is affirmed.

The decree is reversed in the respects mentioned and the cause is remanded for further proceedings not inconsistent with this opinion.