## CHATZ v. ARMOUR PLANT EMPLOYEES' CREDIT UNION.

## SAME v. TODD et al.

### Nos. 8794, 8795.

Circuit Court of Appeals, Seventh Circuit.

Feb. 23, 1946.

As Amended on Denial of Rehearing
April 24, 1946.

MAJOR, Circuit Judge, dissenting.

Harry A. Biossat, Joseph Z. Willner, and Euclid L. Taylor, all of Chicago, Ill., for appellants.

Harry H. Ruskin, Loren E. Lewis, Jerome Wald, and Simon H. Alster, all of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a judgment rendered in an accounting suit, in favor of plaintiff, as trustee of the estate of one Howard Haberman, bankrupt, against the defendants. The subjects of the litigation are money loaned, interest charged for services rendered, and payments made. Bankrupt was the borrower. Defendants either loaned the money or rendered services and made charges for both. The disputes and contradictions in the evidence were almost as many as there were transactions. Few, if any, dealings are not involved in dispute. The trial was long. The record before us is voluminous.

The Facts: Bankrupt conducted a ready-made clothing store on Chicago's south side, where sales were made on the installment payment plan. The customers were largely negro employees of Armour Packing Company, who worked as steadily as the demands of the business permitted. The demands, however, were not constant, and the employees temporarily out of employment could not, and did not make the payments of $2.00 per week, which was the

usual installment payment provided for in the contract of sale.

An important part of bankrupt's business was the collection of sums due on the installment sales. This phase of its business led to bankrupt's contacts with Todd[1] and Talley[2] and through Todd and Talley with Armour Packing Company.[3] Obtaining assignments of wages and keeping bankrupt's customers on Armour's payroll were the secret of the success or failure of the enterprise. At least we so infer from the story revealed by the record. A high grade of salesmanship in men's clothing was not required, nor was the price important. It was the extension of credit which made sales. It was the collection of these accounts which supplied the chief cause of bankrupt's worries. The cost of the latter was doubtless included in the cost of the merchandise. It was readily accepted by the customer if only he were extended credit. It is also inferable from the record that failure to make collections satisfactorily, brought on the failure and the bankruptcy of Haberman.

This suit grew out of the contacts and subsequent dealings between Todd and Talley and the bankrupt, who failed because of failure of collection and volume of business, which was in turn traceable to the loss of employment by bankrupt's customers, who, to a certain extent, lost their employment because of the slump in the number of cattle and hogs slaughtered by Armour in Chicago. The decline in the volume of Chicago packing house business was due to conditions with which we need not concern ourselves.

One of the defendants, Armour Plant Employees' Credit Union[4], advanced cash to bankrupt on application of an Armour employee who was purchasing a suit from the bankrupt. A second defendant, the Armour Plant Employees' Service Bureau[5], serviced installment purchases by receiving deductions from employee's pay directly from Armour to cover said installments. Two individual defendants, Todd and Talley, were employees of Armour and prominent in the C. U. and S. B. affairs. They helped to found and were directors and officers of both companies.

The active and guiding spirit in the bankrupt company was one Haberman, who was previously associated with his father-in-law, in a somewhat similar business in another section of the city. Through such business relations with T. and T., he learned of the possibility of financing a business, upon which he was about to embark, through T. and T. and the other two defendants.

The story told by Haberman concerning his contacts and contracts with T. and T. and Armour varies sharply and contradictorily from that told by T. and T., who were the controlling and guiding spirits of the two other defendants. It was Haberman's story that T. and T. assured him that the credit customers would be retained on Armour's payroll or reinstated at the first opportunity after lay-off, so that bankrupt's installment accounts would be promptly paid. He testified that T. and T. not only deducted from all payments the 10% service charge of the S. B. for collecting the installment payments, but in addition charged 10%, which was later increased to 12½% and to 15%. These deductions were made before bankrupt received anything. Plaintiff says this additional charge was to cover the assurance that T. and T. would keep the customers on Armour's payroll. This they failed to do, and therefore plaintiff was entitled to a refund of such deductions.

Defendants' theory or explanation of this charge is that bankrupt was a co-maker of the loans from the C. U. and the sums which were deducted constituted a reserve fund to cover defaulted loans and a part of such deductions went to Armour employees' organizations for sales promotion.

Plaintiff denies bankrupt was a co-maker on, or a guarantor of the C. U. loans.

The court found in favor of plaintiff on this issue. It found for the plaintiff on all disputed fact issues.

It accepted more readily and fully the testimony of Haberman than it did that of either T. or T. or both of them. To a degree the factual issues involve the credibility and veracity of these three witnesses. We accept the District Judge's opinion as to their credibility. We might add there

---

[1] Todd was a bookkeeper and time keeper at Armour; retired in 1933.

[2] Talley was on Armour's grievance committee—They are hereafter referred to as T and T.

[3] Hereafter called Armour.

[4] Called hereafter C. U.

[5] Hereafter called S. B.

is little to commend the story of either side. None of the parties was in the business for his health. Each had a palm that itched.

Haberman was desirous of securing credit. His capital was nearly all borrowed money. Conducting a sizable installment payment clothing business, he needed capital which he did not possess. With capital he could extend credit and easy terms to a class of customers to whom he sold clothes and who were not averse to buying on credit. As a result, bankrupt greatly increased the volume of his business and the size of his loans. To maintain this position, he needed help from Armour, both in acceptance of wage assignments and in giving priority of employment to those wage earners who were his customers. Bankrupt found what he sought in the two companies above named, operated by T. and T., who asserted connections with, and an inside approach to, Armour. It does not appear how they were to secure preferential treatment of bankrupt's customers by Armour, but T. and T. evidently convinced bankrupt that they did receive and could deliver such preferential treatment by Armour.

For the services rendered by T. and T. and by both C. U. and S. B., bankrupt paid liberally. In short, the bankrupt wanted preferred, preferential treatment for his customers, and the customers welcomed the services of one who could secure such advantages from Armour. T. and T. with asserted positions of vantage with Armour, sold their services and influence to the bankrupt. It does not clearly appear whether the influence thus sold was real or merely sales talk by T. and T.

The story came to a most unhappy ending. With the store in bankruptcy and Haberman making charges of over reaching against defendants, who deny the charges, the parties found their way into court, which was, in this instance, the federal court, due apparently to the intervention of bankruptcy.

At the end of a trial where disputes and contradictions abound, a judgment was finally entered in favor of the trustee of the bankrupt estate of Howard Haberman against S. B. and C. U. for the sum of $60,659.37 and against T. and T. and S. B. for $45,192.21. The judgment also provided that T. and T. be allowed the sums of $3,612.54 and $16,614.25 as credit against plaintiff's claim and such sums were credited to said T. and T. in the $45,192.21 computation. It was further adjudged that all bankrupt's notes held by T. and T. be declared paid and satisfied and T. and T. are directed to deliver them to plaintiff.

In entering the $105,851.58 judgment in favor of the plaintiff, the court made the following statement:

"A—Amounts Due Plaintiff.

| | | |
|---|---|---|
| Deductions by A. Todd and C. H. Talley for 'assurance agreement' from March 1, 1935 to October 1, 1938 | $16,945.53 | |
| Plus 5% interest per annum | 6,466.64 | $ 23,412.17 |

(Finding No. 24)

| | | |
|---|---|---|
| Deductions by A. Todd and C. H. Talley from proceeds from Armour Employee Credit Union loans received by false representations and without consideration | $10,076.75 | |
| Plus 5% interest per annum | 5,089.70 | 15,166.45 |

(Finding No. 25)

| | | |
|---|---|---|
| Deductions applied on Armour plant Employees' Credit Union defaulted loans | $43.297.14 | |
| Plus 5% interest per annum | 17,362.23 | 60,659.37 |

(Finding No. 29)

| | | |
|---|---|---|
| Net amount admitted to have been received by Defendants Todd and Talley on collections on $50,275.57 of Haberman's Armour accounts | $13,236.64 | |
| Plus 5% interest per annum | 3,915.42 | 17,152.08 |

(Finding No. 35)

| | | |
|---|---|---|
| Money due Plaintiff on Haberman accounts receivable turned over to Todd and Talley between October 1, 1938 and July, 1939 | | 8,335.32 |

(Finding No. 36)

| | | |
|---|---|---|
| Deductions by A. Todd and C. H. Talley to apply on note for $10,670.00 | | 1,353.00 |
| Total | | $126,078.37 |

(Finding No. 34)

B—Credits Due Defendants Todd and Talley on Above.

| | |
|---|---|
| Credit due A. Todd and C. H. Talley on advances to Haberman | $ 3,612.54 |

(Finding No. 32)

| | |
|---|---|
| Credit due A. Todd and C. H. Talley on claims re Dr. Higgins' transactions | 16,614.25 |
| Total | $20,226.79 |

(Finding No. 38)

Recapitulation.

| | |
|---|---|
| Due Plaintiff | $126,078.37 |
| Credit due A. Todd and C. H. Talley | 20,226.79 |
| Net Amount Due Plaintiff | $105,851.58" |

The judgment directs that of this sum, $60,659.37 be recovered of S. B. and C. U.; and the remaining $45,192.21 be recovered of S. B., C. U. and T. and T.

The bankrupt's clothing store was opened in February, 1934; bankruptcy was filed July 27, 1939; and the instant suit begun May 19, 1941.

In the welter of confusion which follows a study of the conflicting evidence which required four volumes to set it forth, two legal propositions emerge as controlling:

(1) Findings of fact shall not be set aside unless clearly erroneous, and due regard should be given to the trial court to judge of the credibility of witnesses. Rule 52, Rules of Civil Procedure, 28 U.S.C.A. following section 723c. A few of the many cases wherein this rule is applied are cited in the margin.[6]

(2) A challenge of a finding of fact must be examined on appeal where the appellant asserts that the lower court's finding (a) is unsupported by substantial evidence, or (b) is contrary to the clear weight of the evidence, or (c) is induced by an erroneous view of the law.[7]

Counsel for both parties are agreed as to these rules which govern their respective contentions. Dispute is sharp over the asserted total want of evidence, as well as the existence of evidence which clearly shows that the findings are fatally erroneous.

There are two factual questions upon which the court made findings which weigh heavily in the disposition of the case. These vital questions, covered by different findings, are:

(a) The existence of duress exercised by defendants on bankrupt when the Haberman agreement of August, 1935, was made. The court found for plaintiff on this issue:

"46. In * * * the transactions between Haberman and the Defendants, Haberman was forced to sign numerous documents and papers. Among said documents was the so-called authorization of August 16, 1935. Todd and Talley told Haberman that he must sign this document, or they would 'cut him off' and Haberman's only alternative was to sign said document or be forced out of business."

(b) The existence of a guarantee contract made by the defendants T. and T. whereby

"* * * In addition, Todd and Talley agreed with Haberman that if Haberman sold merchandise to Armour & Company employees on an installment basis, the said Todd and Talley would assure Haberman that all of said accounts would be fully paid and that he would sustain no losses thereon * * *. Todd and Talley thereby agreed to insure Haberman against any loss on any of said accounts receivable, and assured Haberman that the same would be paid in full, * * *."

The agreement which became the storm center of this suit and the subject matter upon which the duress finding was directed and is of controlling importance on this appeal was signed by Haberman, August 16, 1935, and reads as follows:

"Armour Plant Employees Credit Union

and

Armour Employees Service Bureau, att: Mr. A. Todd:

"I, Howard Haberman, hereby authorize you to retain Forty (40%) per cent of the amount collected each week by you for the account of the Morton Clothiers and apply same against delinquent M. accounts in the Credit Union until the delinquent M.

---

[6] Alabama Power Co. v. Ickes, 302 U. S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669; Great A. & P. Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293; United States v. Jefferson Elec. Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859; Ætna Ins. Co. v. Kennedy, 301 U.S. 389, 57 S.Ct. 809, 81 L.Ed. 1177; Reinstine v. Rosenfeld, 7 Cir., 111 F.2d 892; Webb v. Frisch, 7 Cir., 111 F.2d 887; Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 120 F.2d 891; Rytex Co. v. Ryan,

[7] Cir., 126 F.2d 952; Skinner v. Pennsylvania Greyhound Lines, 7 Cir., 123 F.2d 497; United States v. Borg-Warner Corp., 7 Cir., 108 F.2d 424.

[7] Morley Const. Co. v. Maryland Cas. Co., 300 U.S. 185, 57 S.Ct. 325, 81 L. Ed. 593; Harkin v. Brundage, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457; Collier v. United States, 173 U.S. 79, 19 S.Ct. 330, 43 L.Ed. 621; Lawson v. United States Min. Co., 207 U.S. 1, 28 S.Ct. 15, 52 L.Ed. 65; Campana Corp. v. Harrison, 7 Cir., 114 F.2d 400; Pickering v. Corson, 7 Cir., 108 F.2d 546; Flynn v. Smith, 7 Cir., 90 F.2d 305.

accounts are paid in full. Also to retain each week amount of interest due on said M. accounts and pay said interest to Credit Union.

Howard Haberman."

This agreement was written on Haberman's own letter head and was in his own handwriting. Disposition of the issue which it raises involves item 3 or $60,659.37 of the judgment.

The only testimony tending to establish duress in execution of this agreement came from Haberman. We therefore repeat his story as he gave it.

"Q. Now, directing your attention to a period in or about the spring of 1935, did anything unusual occur at that time with respect to—

"A. Well, during January and February of 1935 it seemed that the plant fell to pieces. * * * A lot of people were laid off.

"Q. Any of your customers or people whose accounts receivable you had turned over to the Service Bureau?

"A. Hundreds of them.

*    *    *    *    *    *

"A. I went down to * * * T.'s office and I asked Mr. Todd to see to it that Talley put these people back to work, and I think it was at the same time that I spoke to him, at that particular time, that he said, 'From here on out, we are not going to put any more loans through the Credit Union.'

"* * * this conversation (was between) * * *

"Mr. Todd and I. It took place in Mr. Todd's office, and then he said to me, 'We want to make deductions out of your Service Bureau check to pay the Credit Union.' I said, 'What about the fellows that you are supposed to keep working? I didn't guarantee your Credit Union accounts, and you are going to keep my money to pay up these Credit Union Accounts? I won't have any money left. I won't have any funds at all to continue my business, and you have no right to do that.'

"This is what he said: 'If you object to any of the things that we want to do, we are going to cut you off. We will interfere with the collections of your Service Bureau acounts. If you serve any wage assignments down here, we will see to it that we will not hold up these checks. We intend to make you pay for the Credit Union loans.' I said to him, 'Well, if you do that, I will not have any money to continue my business with.' He said, 'I will talk to Talley, and we will arrange to make you a large loan.'

"That was that one day. The next day, I came down there, and they said, 'We are going to make you a loan'—I had received some advances during February and the beginning of March, and the next day when I came down they had arranged between them to make a loan to me, and, at the same time, they had a document there assigning all of my accounts in the Service Bureau to them for the purpose of paying the Credit Union. When I saw that document, I said to Mr. Todd, 'Is this what you are going to do to me now?' He said, 'If you don't sign that document, we are not going to give you any money, and we are through with you.' It was like a blow between the eyes.

"Q. Now, at that time how much Credit Union loans were outstanding, approximately, on the books of the Credit Union? That is, to your knowledge?

"A. To my best memory of this, it was about fifty thousand dollars. It might have been a little more. I don't remember."

We ignore entirely defendants' testimony that Haberman was liable for these loans as a co-maker as our inquiry now is directed to the sufficiency of the evidence to sustain a finding of duress.

It would serve little purpose to discuss the applicable decisions at length. They are many. In view of them [8] we are not justified in restating reasons for our conclusions. Construing the testimony most favorably in support of this finding, as we are required to do, we are persuaded that there is no evidentiary support for a finding of duress.

---

[8] United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 86 L. Ed. 855; Barnette v. Wells Fargo Nevada Nat. Bank, 270 U.S. 438, 46 S.Ct. 326, 70 L.Ed. 669; Burnet v. Chicago Ry. Equip. Co., 282 U.S. 295, 51 S.Ct. 137, 75 L.Ed. 349; Union P. R. Co. v. Public Serv. Corp., 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131; Cleaveland v. Richardson, 132 U.S. 318, 10 S.Ct. 100, 33 L.Ed. 384; 17 American Jurisprudence, "Duress and Undue Influence," p. 872, et seq.

Equally conclusive on this issue of duress is the failure of plaintiff to seasonably seek avoidance of the agreement because of the alleged duress.[9] For three and a half years plaintiff acquiesced in the deduction of 40% of the accounts to satisfy defaulted C. U. loans. For three and a half years bankrupt Haberman continued to borrow money and to accept services from T. and T. Even when bankruptcy was imminent and he sought the services of attorneys, he made no claim of duress. His only charge was usury. His complaint was sworn to and dealt with deductions pursuant to this agreement. His silence at this time confirmed his action for the three and a half years following its execution.

Lack of consideration for this agreement, here asserted by appellee is hardly worthy of separate consideration in this opinion. A valid consideration is to be found in (a) extension of existing credit and the making of additional loans, and (b) the settlement of the dispute over bankrupt's liability in addition to that of his customers'.

We now turn to the other mooted finding (heretofore quoted) attacked by appellants and to the effect that payment of the Haberman installment accounts was *guaranteed* by T. and T. While the execution of such a guarantee was possible, the likelihood that men of judgment would, for ten per cent of the accounts collected, guarantee the payment of all accounts in full, challenges credulity. Keeping in mind the nature of the transaction, namely, the sale of suits to customers who purchased on the installment payment plan and who worked at a more or less uncertain employment in a Chicago packing house, and accepting bankrupt's statement that the normal losses on such accounts exceeded ten per cent, it would be unlikely that any responsible party would guarantee such accounts when receiving only an ordinary collection fee (10%) of the amounts collected, therefor.

However, here again the challenge of appellants is to the sufficiency of the evidence to sustain the finding. Again we temporarily set to one side and ignore the denials of T. and T. and all of the circumstances surrounding the transactions. Again we pass to the testimony of Haberman upon whose statement this alleged guarantee depends for its existence.

Was his testimony, assuming its verity, sufficient to establish a guarantee? Again we must find our answer in the testimony.

Haberman testified:

"* * * I said, 'Now, Mr. Todd informs me that you can put anybody back to work that you want to and that you can keep these men working,' and I said, 'If such is the case and if you promise to keep these men working, I have discussed this with my father-in-law and we are willing to pay an additional ten per cent, because we find that our losses in sales run between ten and eleven and eleven and a half per cent and if you can keep these men working until we collect our money on any indebtedness, or if a man gets laid off and you are able to put him back to work, our losses will be nil and I would be willing to pay you ten per cent for that,' and he said, 'All right,' and I said, 'Before I agree to this I want to talk to Mr. Todd,' and I went back to Mr. Todd's office and I discussed this with him and he said, 'Well, now, Haberman, I told you what his duties are here and I told you what he can do and what he can't do and he can keep your men working and you take my advice and go ahead into the thing.'"

At another point Haberman testified:

"* * * And then I asked him about these employees, whether for that additional amount of ten per cent they would keep those employees working and he said 'Yes,' and I spoke to Talley about that and he said 'Yes'—I put the same question to Talley and he said 'Yes,' and I said, 'There are not going to be any changes,' and he said 'No. You know that we have been keeping the employees who were laid off from Boulevard at work and I don't see why we can't continue to do so.' He said, 'I can do it and go ahead with your plans.' * * * on the same day I went into Mr. Talley's office at the other end of the building and I spoke to him and I asked him if I would get the same consideration that had been given Boulevard for the same fees and he said 'Yes' and I said 'There isn't going to be any reason why you cannot keep these men at work if I pay you the additional money such as Boulevard is paying you' and he said 'No, that is all right.'"

A cousin of Haberman testified that in 1934, in many cases, men who had been

---

[9] Barnetto v. Wells Fargo Nevada Nat. Bank, 270 U.S. 438, 46 S.Ct. 326, 70 L. Ed. 669; 17 Am.Juris., "Duress," § 25.

laid off were sent down to see Mr. Talley. In a week or so collections would again come in from these employees' pay.

Accepting Haberman's testimony in full, it falls short of an agreement to guarantee payment of all the Armour employees' accounts. The most that can be said of it is that T. and T. agreed to keep the employees on the payroll and if an Armour employee customer of bankrupt was dropped T. and T. would get him back on the payroll. This agreement was not a guarantee to pay the accounts in full.[10] We conclude therefore that the finding is unsupported by the evidence.

In our examination of the voluminous record, it is clear that second in importance to the disputed existence of a guaranty contract and alleged duress by defendants, is the appraisal of bankrupt's testimony on defendants' alleged agreement to keep bankrupt's customers on Armour's payroll. This appraisal must be made in the light of his actions, his previous statements, and his written agreements.

In addition to testifying on this trial Haberman testified before the referee in bankruptcy in regard to many of the transactions and conversations related by him on this trial. His two stories are irreconcilable.

Bankrupt also brought a suit against defendants shortly before the bankruptcy proceedings were instituted. He stated his grievance there. It was a charge of usury. None of the claims here made were set forth in that complaint. The complaint covered the entire period here involved. In fact his verified complaint in that suit refutes the claim which plaintiff here made. Bankrupt set forth in detail transactions which not only are irreconcilable with plaintiff's presently asserted charges, but they confirm the defendants' position on this trial.

Bankrupt also executed numerous written agreements, the contents of which are at irreconcilable variance with the asserted guaranty by defendants to pay all the accounts of Armour employees who bought clothing of bankrupt. Reconcilability of these agreements with the defendants' asserted agreement to keep all of bankrupt's Armour customers on the Armour payroll until bankrupt's accounts were paid in full, is impossible.

For example, it is impossible to accept plaintiff's presently asserted position with bankrupt's signature on notes to defendants, or with his written guarantees to defendants, or with his written authorization to defendants to withhold 40% of the Armour customers' collections until *bankrupt's indebtedness* to defendants was paid *with interest*. The interest agreement is interesting as it indicates the existence of a loan and that bankrupt was the borrower and he was paying the interest. Nor can bankrupt's retention of the customers' notes be reconciled with any factual disposition, save on the theory that it was the bankrupt who was the debtor, not the customers, and bankrupt was the guarantor of said accounts to defendants, rather than that defendants were guarantors of all the accounts to bankrupt.

If defendants had guaranteed the payment of all bankrupt's sales to Armour employees, it is inconceivable that bankrupt should be signing such agreements. Likewise, if defendants were to keep the said customers on the Armour payroll until the bankrupt's claims were paid in full (an impossibility known to plaintiff as well as to defendants),[11] how can this be reconciled with bankrupt's signing notes to defendants, signing written guarantees of accounts and given to defendants in final settlement in 1938 as security of nearly all their past transactions.

It is next to impossible to reconcile the acts charged in this suit with the statements (and the claims made) in the complaint known as the Grossberg complaint.

It is impossible to recognize the sworn testimony of bankrupt before the referee

---

10 American Jurisprudence, "Guaranty," §§ 56, 57. Burlington Ins. Co. v. Johnson, 120 Ill. 622, 12 N.E. 205; Solomon v. Waterbury Brass Goods Corp., 2 Cir., 6 F.2d 990; Guerra v. American Colonial Bank, 1 Cir., 21 F.2d 56.

11 Sickness, accident, death and constitutional opposition to, or dislike of work, contributed almost as much as variance in live stock receipts at the Chicago Stock Yards to unemployment of bankrupt's customers. Bankrupt, speaking of live stock receipts said, "During January and February, 1935, it seemed that the plant fell to pieces. Men who had been there for ten years, eight years, four years, and two years were laid off." The undisputed testimony of Armour officials was to the effect that continuous, uninterrupted employment of these workers was impossible.

in bankruptcy with the plaintiff's claims here made.

It is signficant that plaintiff sues in a representative capacity. He was not the factual adversary. He must rely upon the bankrupt's testimony to establish the claims set forth in his complaint. It is not a controversy between plaintiff and defendants but rather one between said bankrupt and defendants.

It is impossible to find that an agreement was reached whereby defendants agreed to keep the Armour employees on the Armour payroll until all accounts were paid.

Had this agreement and the guarantee agreement been made, bankrupt would have had none of the financial trouble that beset him at all times. He would never have signed, nor have been asked to sign, the said asserted agreements of the defendants. We are therefore forced to find against the plaintiff not only on the alleged guarantee agreement, but also against him on the issue of keeping all Armour's employee customers employed until all accounts were paid.

Doubtless it was understood that defendants should help in the collection of accounts against Armour employees. They were paid 10% of the collections therefor. An implied agreement was inferable therefrom. Their agreement was in reality a collection account agreement. They had an interest, not as great, but like bankrupt's, in keeping customers employed, for they received a 10% collection fee on the deductions on payments made pursuant to the wage assignments. The wage assignments served on the employer were a way of insuring payment of the accounts by the employees. It was used here. T. and T.'s long connection with Armour was helpful. That help was what bankrupt sought and received. It would not only be contrary to the evidence, but contrary to the relevant associated facts and contrary to common sense and normal judgment to assume that defendants would, and did, for 10% of the accounts collected, guarantee the full payment of thousands of unsecured notes given by individuals working for Armour who were unable to pay for cheap suits of clothes purchased on the $2 a week installment plan.

With these three dominating fact contentions settled, the final propositions become free of disputes and perplexities. It eliminates counsel's disagreements as to interest charges allowed to the plaintiff by the court in the final accounting. It avoids the sharply disputed fact controversy as to the amount of collections and the extent of the services rendered by appellants, where the books show conclusively that many thousands of accounts were paid monthly by Armour pursuant to the wage assignments of its employees.

In the final disposition of this appeal, which turns on three factual controversies, plaintiff, of necessity, has to depend on the testimony and record of the bankrupt, much of which was evidenced by written agreements made at a time when litigation was not contemplated. These documents can not be changed by oral testimony after the transactions are ended. Truth may be reconciled only with their existence and their contents. The facts are thus written and the evidence is inerasable.

They constitute the story which bankrupt wrote concerning this hectic and ill-fated enterprise. Beginning in 1934 when the ship sailed out on rough waters, it was soon caught by storms and rocked and tossed about until the voyage was ended in 1938 and the bark limped into port (or haven). It was the same port into which many a ship has arrived with a similar story of blasted hopes and an overloaded cargo of disappointments. This port is far from the one bound for. For it is known as the port of bankruptcy.

The story which the voyager relates is often, perhaps too often, to encourage conviction in its veracity, accompanied by an alibi offered by the adventurer, later the bankrupt. The alibi consists of recitals of credit denied or refused, or credit withdrawn, when as a matter of fact the venturer started out on a shoe string and was inspired by tales of venture with success and glory the only possible ending.

The defendants have waived their claims for advances for which they make claim under their counterclaim, because of the worthlessness of a judgment against bankrupt, or bankrupt's assets, if recovery were to be had. We dismiss them from consideration.

The judgment is reversed with directions to dismiss the action.

MAJOR, Circuit Judge (dissenting).

If this court were the trier of the facts, I would agree with the persuasive reason-

ing of the opinion that the case should be decided against the plaintiff. I am unconvinced, however, that the findings of the trial court are without substantial support. In my opinion, plaintiff was not as a matter of law entitled to recover interest upon any of the various amounts found to be due and included in the judgment. I would, therefore, reverse the judgment insofar as it includes the allowances for interest. In all other respects, I would accept the findings of the trial court and affirm.

DOBIE, Circuit Judge, dissenting.